IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    1:14-CR-276 (MAD) |
| | ) | |
| **v.** | ) | **GOVERNMENT'S SENTENCING** |
| | ) | **MEMORANDUM** |
| **JOHN W. CALTABIANO, Jr.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, hereby files its sentencing memorandum requesting that the Court upwardly depart one criminal history category to adequately reflect the serious of the defendant's past criminal conduct and likelihood of recidivism, pursuant to U.S.S.G. §4A1.3, sentence the defendant to a term of imprisonment within the resulting 57 to 71 month Guidelines range, and impose an order of restitution in the amount of $27,784, an order of forfeiture in the amount of $27,784, and a special assessment of $700.

## INTRODUCTION

On October 16, 2015, a jury found the defendant guilty of conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1341 and 1349 (Count 1); five counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts 2 through 6); and theft of government property, in violation of 18 U.S.C. § 641 (Count 11).   The defendant is scheduled to be sentenced on April 14, 2016.[1]

---

[1]   The government reserves the right to respond to defense arguments raised for the first time after filing of this memorandum.   Similarly, if the Court is considering a *sua sponte* departure from the applicable sentencing guidelines range on a ground not previously identified by the parties or in the Presentence Investigation Report, the parties are entitled to notice and an opportunity to respond.   *See* Fed R. Crim. P. 32(i)(1)(c), 32 (h).

**APPLICABLE STATUTORY AND GUIDELINES PROVISIONS**

**1.      Statutory Maximum and Minimum Sentences**

The defendant's convictions for conspiracy to commit mail fraud, mail fraud, and theft of government property subject the defendant to statutory maximum terms of 20, 20, and 10 years of imprisonment, respectively.   *See* 18 U.S.C. §§ 1341, 1349, and 641.

The seven counts of conviction subject the defendant to maximum statutory fines of $250,000 per count, *see* 18 U.S.C. § 3571(b), and a term of supervised release of up to 3 years. *See* 18 U.S.C. §§ 3583 and 3624(e).

**2.      Guidelines Provisions**

**a.      Base Offense Level**

Under the federal sentencing guidelines, the "base offense level" for the defendant's conviction for conspiracy to commit mail fraud is 7.[2]  *See* U.S.S.G. §2B1.1(a)(1).

**b.      Loss Amount**

As set forth in the Presentence Investigation Report ("PSR") at ¶ 56, the offense level is increased by 14 because the intended loss was more than $550,000 but less than $1,500,000.  *See* U.S.S.G. §2B1.1(b)(1)(H).

The jury convicted the defendant and his co-conspirator, Colleen McCarten, of, *inter alia,* conspiring to defraud the Social Security Administration ("SSA") and Travelers Insurance Company ("Travelers") from April 2008 through October 2010, as charged in Count 1.  The

---

Further, the United States respectfully requests that the Court provide the parties with any *ex parte* communications received by the Court in connection with sentencing, with the exception of the confidential sentencing recommendations submitted by the United States Probation Office.

[2]  The seven counts of conviction are grouped because "the offense level is determined largely on the basis of the total amount of . . . loss."   U.S.S.G. §3D1.2(d).

2

Guidelines define loss as "the greater of actual loss or intended loss."   U.S.S.G. §2B1.1, Application Note 3.   Further, under the Sentencing Guidelines:

> "Intended loss" (I) means the pecuniary harm that was intended to result from the offense;   and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

U.S.S.G. §2B1.1, Application Note 3(A)(ii).   Accordingly, the loss amount for purposes of U.S.S.G. §2B1.1(b)(1) includes not only the losses actually suffered by SSA and Travelers (*i.e.,* benefits actually paid as to which the defendant was not entitled), but also those benefits payments that the defendant intended that the victims would pay in the future.

Courts have repeatedly upheld, as intended loss in disability fraud cases, the inclusion of future benefits that would have been paid had the defendant not been caught.   *See, e.g., Clarke v. United States*, 257 Fed. Appx. 361 (2d Cir. 2007) (affirming district court's determination that the intended loss should include the future SSD benefits the defendant would have received); *United States v. Killen*, 761 F.3d 945, 950 (8th Cir. 2014) (affirming district court's inclusion as intended loss future Social Security benefits payments that the defendant would have received had her scheme not been discovered, over the objection of both the government and the defendant, and recognizing that "a district court may reasonably conclude that the defendant intended continued receipt of illegal benefits until retirement without additional *mens rea* evidence."); *United States v. Frisch*, 704 F.3d 541, 544 (8th Cir. 2013) (affirming district court's inclusion in loss calculation of Social Security benefits payments that the defendant would have continued to receive until age 66, and holding that "[w]hen calculating intended loss, the appropriate inquiry is what the loss would have been if the defendant had not been caught."); *United States v. Henderson*, 416 F.3d 686, 695 (8th Cir. 2005) ("Because the jury found that [the defendant] intended to continue receiving SSDI, when it actually ended is irrelevant to calculating the intended loss."); *United States v.*

*Rettenberger*, 344 F.3d 702, 708 (7th Cir. 2003) ("[The defendant] set out to take the insurers for all they were worth, and that meant benefits through age 65.   What would have induced him to disclaim benefits earlier?").

As discussed below, had the defendants' scheme not been discovered, Caltabiano would have received benefits to which he was not entitled in a total amount of approximately $1,026,608. He would have continued to receive Social Security Disability ("SSD") benefits until age 67, and would have continued to receive Workers' Compensation ("WC") benefits for the rest of his life. The evidence demonstrates that this is just what the defendant intended when, with McCarten's help, he repeatedly presented himself as blind and unable to move around without assistance to SSA, the Workers' Compensation Board, and Travelers.

"The government has the burden of proving facts relevant to sentencing by a preponderance of the evidence."   *United States v. Desimone*, 119 F.3d 217, 228 (2d Cir. 1997). The Court is not required to determine the defendant's intended loss with "precision," but rather must "make a reasonable estimate of the loss . . . based on available information."   U.S.S.G. §2B1.1, Application Note 3; *United States v. Manas*, 272 F.3d 159, 165 (2d Cir. 2001); *See, e.g., United States v. Burns*, 104 F.3d 529, 536 (2d Cir. 1997); *United States v. Gomez*, 31 F.3d 28, 31 (2d Cir. 1994).

i.   <u>Social Security Disability Benefits</u>

As set forth in the Declaration of Raymond Egan, Deputy Assistant Regional Commissioner for Management of Operations and Support for Region II of SSA, attached hereto as Exhibit 1, had the defendants' scheme to defraud not been discovered, Caltabiano would have

collected at least $306,852.40 of SSD benefits (including child benefits) before age 67.[3]  *See* Exhibit 1 at ¶¶ 8-19.  Of this amount, Caltabiano and was entitled to at most $20,244 for the period from his injury to April 2008, *see id.* at ¶¶  8-10, by which time the proof at trial showed the defendants were engaged in the conspiracy to defraud.   Thus, the defendant's intended SSD loss is at least $286,608.40.

ii.      Workers' Compensation Benefits

With respect to Workers' Compensation, because the defendants presented Caltabiano as completely blind in both eyes and totally disabled, had their scheme not been discovered there would have been no durational limit on Caltabiano's workers' compensation benefits.   *See* Trial Testimony of Anthony Perez, at 15-16, 20-21, attached hereto as Exhibit 2.   Travelers would have continued to pay Caltabiano weekly benefits until his death or "[u]ntil the Workers' Compensation Board determined to cease such benefits or directed Travelers to cease such benefits."  *Id.* at 16, lines 5-9.   The defendants' fraudulent scheme was designed to prevent the Workers' Compensation Board from finding that Caltabiano was no longer essentially completely blind, a change in his medical condition that they knew would have reduced and eventually eliminated his benefits payments.

On average, a male born on Caltabiano's birth date and alive on today's date is expected to live to be approximately 82.3 years old.  *See* Social Security Administration Life Expectancy Calculator, located at https://www.socialsecurity.gov/cgi-bin/longevity.cgi.[4]   Thus, "a reasonable

---

[3] Because Caltabiano was born after 1960, he will not become eligible for full retirement benefits until age 67.  Until that time, he would have continued to receive Social Security Disability benefits payments.

[4] A more detailed actuarial life table, based on 2011 mortality rates, can be found at https://www.ssa.gov/oact/STATS/table4c6.html.

estimate of the loss . . . based on available information," U.S.S.G. §2B1.1, Application Note 3, should reflect the benefits payments that Caltabiano would have been received until he was 82.3 years old.  As Mr. Perez testified, had the defendants' scheme not been discovered, Travelers would have paid Caltabiano more than $804,000 of workers' compensation benefits by the time he reached age 80.  *See* Exhibit 2 at 18, lines 2-4.

Of this amount, the maximum workers' compensation benefits the defendant would have been entitled to receive was 160 weeks, or $64,000, because, at the time, 100% loss of use of a single eye rendered one eligible for 160 weeks of benefits.  *See* Trial Testimony of Laurie Hart, p. 8 at 10-21, attached hereto as Exhibit 3.[5]  Thus, the defendant's intended workers' compensation loss is at least $740,000 (*i.e.*, $804,000 minus $64,000).

Combined with the intended SSD loss, the defendant's total intended loss is approximately $1,026,608.

> iii.  The Defendant's Objections to the Intended Loss Calculation are Without Merit.

The defendant argues that "the notion that Caltabiano's medical condition never would have changed and that he would have received Workers' Compensation benefits until age sixty, or beyond, is highly speculative."  PSR Addendum at 43.  According to the defendant, "to imply [that Caltabiano's depression and visual] impairment and inability to work would have continued to for the balance of his natural life is fraught [with] speculation and conjecture."  *Id.*  The defendant's argument ignores the evidence presented at trial, the jury's verdict, and the case law cited above concerning the calculation of intended loss in disability fraud cases.  The question is not when Caltabiano's vision would have improved.  The evidence presented at trial demonstrated that Caltabiano was feigning the extent of his visual impairment – the primary

---

[5]  In Caltabiano's case, the benefits amount was $400 per week.  *See id.*, p. 24 at 20 – p. 25 at 2.

underlying cause of both his depression and his purported inability to function outdoors or without assistance – by April 2008.   He was falsely portraying himself as essentially blind in both eyes to his treating physicians, SSA, the Workers' Compensation Board, and Travelers, including at the April 2008 independent medical examination performed by Dr. Perlmutter, and the July 2008 workers' compensation board hearing.   The relevant question is how long Caltabiano's victims would have had to continue paying benefits had the defendants' scheme not been discovered.

The intended loss calculation set forth in the PSR is based upon the uncontroverted declaration of Raymond Egan, Deputy Assistant Regional Commissioner for Management of Operations and Support, in Region II of the Social Security Administration, attached hereto as Exhibit 1, the testimony of Mr. Perez, attached hereto as Exhibit 2, and straightforward mathematical and actuarial information set forth above.   The information provided, and the law, make it both reasonable and appropriate for the Court to find that the loss is $1,026,608 based upon the preponderance of the evidence.   The Court is not required to determine the intended loss with "precision," but rather must "make a reasonable estimate of the loss . . . based on available information."   U.S.S.G. §2B1.1, Application Note 3.

It is notable that the 14-level loss enhancement applies in the case of a loss falling in the range of more than $550,000 to $1,500,000.   As a result, the same 14-level enhancement would apply even if one were to assume that Caltabiano's lifespan is far less than the expected average 82.3 years for males born on his birthdate.   Indeed, had the defendants' scheme not been discovered, the loss would have been more than $550,000 even if Caltabiano lives only to age 60,

in early 2026 (approximately 10 years and 10 months from today's date).  This would be a lifespan more than seven years shorter than either of his parents.[6]

In seeking a hearing on Caltabiano's benefits – the Workers' Compensation Board hearing that ultimately took place on July 16, 2008 – Travelers was attempting to demonstrate that Caltabiano was not disabled.  Travelers' had to do so because, unless and until the Board found a change in his medical condition, Travelers' would have to pay Caltabiano $400 per week.  The defendants made every effort to ensure that the Board would never find such an improvement that would result in Caltabiano's benefits ending once he had been paid the maximum amount for 100% loss of use in a single eye.  The evidence at trial demonstrated that Caltabiano was led by McCarten into the room for the April 8, 2008 independent medical examination by Dr. Perlmutter as if Caltabiano were blind, and that Caltabiano claimed that he lived in total darkness at home and refused to permit Dr. Perlmutter to examine his eyes.  In June 2008, as reflected in surveillance video, Caltabiano drove himself and others, moving about in a normal manner and wearing sunglasses on only one of several occasions.  He twice drove through a bank drive through and

---

[6] As of January 31, 2026, the benefits paid would have been approximately $559,276, comprised of:

    (a)    $354,800 of workers' compensation benefits:  887 weeks at a rate of $400 per week, from January 28, 2009, (the date at which 160 weeks of workers' compensation benefits for 100% loss of use for a single eye, to which Caltabiano was arguably entitled, would have been fully paid) through January 31, 2026;

    (b)    $27,787 of SSD benefits actually paid from May 2008 through November 1, 2010, as set forth in Exhibit 1 at ¶¶ 11-14;

    (c)    $158,112 of SSD benefits payments that would have been paid:  183 months at a rate of $864 per month, from November 1, 2010, through January 31, 2026; and

    (d)    $18,577 of additional SSD auxiliary benefits that would have been paid to Caltabiano's daughter to age 18, as set forth in Exhibit 1 at ¶¶ 17 and 19.

went shopping at several stores.   He drove his daughter to school.   And he drove McCarten to a store, where they both went shopping.

It was to the July 16, 2008 hearing – requested by Travelers in an effort to cut off Caltabiano's "temporary total" benefits – that McCarten drove Caltabiano, parked, walked around the car, opened his door, helped him out of the car, and led him by the arm through the parking lot, into the hearing building, into the hearing room, and to his chair, before helping him to sit down, all as if Caltabiano were a blind person.   On not one of the many other days of surveillance was any similar activity observed.   Rather, on several occasions earlier that same month Caltabiano was captured on video driving himself and others, including McCarten, going shopping, and going through a bank drive through.   Two days before the hearing, Caltabiano was captured on video driving himself without sunglasses.

There is no reason to believe that Caltabiano intended that he would ever, at any point in the future, concede that he could function as depicted in the surveillance videos.   Instead, he and McCarten kept up the charade even after they were caught.   After Caltabiano's workers' compensation benefits were cut off following the presentation of the surveillance video recordings, Caltabiano appealed the board's decision and continued to represent to both the board and SSA that he was not able to function on his own.    In a September 1, 2009 Function Report, he answered the question whether he could go out alone with:   "No – loses balance and can't see well of out right eye due to lighting."   After both his workers' compensation and SSD payments were terminated, Caltabiano appealed the termination of his SSD benefits.   In a February 2010 SSA form completed by McCarten, they wrote that he "drops things all the time, bumps into things all the time, misjudges distances."   As the court noted in *Rettenberger*, 344 F.3d at 708 ("What would have induced him to disclaim benefits earlier?").

9

**c.** **Criminal History Category and Motion for Upward Departure Pursuant to U.S.S.G. §4A1.3(a)(1)**

As set forth in the PSR at ¶¶ 67-76, the defendant has a total of 6 criminal history points, placing him at the top end of the range that falls within criminal history category ("CHC") III. The government agrees with this calculation, but moves for an upward departure to CHC IV because CHC III substantially under-represents the seriousness of the defendant's criminal history and likelihood that the defendant will commit other crimes.

The Sentencing Guidelines provide for an upward departure if "reliable information indicates that the defendant's Criminal History Category substantially under-represents the seriousness of the defendant's criminal history and likelihood that the defendant will commit other crimes." U.S.S.G. §4A1.3(a)(1). Here, the PSR contains highly specific, reliable information, including, for most of the defendant's prior convictions, factual recitations, annotations citing to the underlying docket numbers, and certificates of disposition.

"In determining . . . whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. §1B1.4. The Guidelines expressly provide that the "criminal conduct underlying any conviction that is not counted in the criminal history score" may be considered by the district court in determining whether a departure is warranted. *See* U.S.S.G. §4A1.2, Application Note 6. The guidelines require a written specification for the basis of the departure, setting forth "the specific reasons why the applicable criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. §4A1.3(c).

The defendant's past criminal conduct reflects a lifetime of crime, including multiple offenses committed while on probation or parole for earlier convictions. More than that, the

10

defendant's pattern of criminal conduct demonstrates that he is a dangerous sexual predator. Overall, his criminal history, summarized below, makes clear that he poses a greater danger to society and risk of recidivism than indicated by CHC III.

i.    Sexual Misconduct Misdemeanor – November 1989 – PSR ¶ 67

On September 3, 1989, Caltabiano was arrested and charged in Coeymans Town Court with Rape 1st, Sexual abuse 1st, Assault 3rd, Unlawful imprisonment 2nd, and Acting in a Manner Injurious to a Child Less Than 16.   On November 16, 1989, he pled guilty to Sexual Misconduct, a misdemeanor, and was sentenced to 1 year imprisonment.   No additional information is known about this offense.

This offense generates no criminal history points because the sentence was imposed more than ten years prior to the defendant's commission of the instant offense.   *See* U.S.S.G. §4A1.2(e).

ii.    Sexual Abuse 1st – March 1991 – PSR ¶ 68

Less than one year after his guilty plea to the lesser offense of sexual misconduct, Caltabiano was arrested on August 26, 1990, and charged in Greene County Court with Rape 1st and Sodomy 1st.   Police reports indicate that, during the early morning hours on August 25, 1990, he picked up a seventeen year old female on Main Street in Catskill under the pretense that he was seeking directions to the Columbia-Greene Medical Center.

The defendant indicated that he was intoxicated and asked the minor female to drive his vehicle to the hospital.   He asked the victim to drive to a remote area off Green Lake Road in the Town of Athens, at which point the defendant produced a handgun, threatened her, and made her perform oral sex and have sexual intercourse with him.   He then drove her to a residence on Cauterskills Road in the Town of Catskill, stating he had to leave the vehicle at his parents'

residence.   They left the vehicle in the driveway, and the two then walked to a convenience store on Main Street in Catskill, at which time the victim threatened to call the police and the defendant walked out of the store.   On the same date, the victim identified Caltabiano from a photo lineup.   When interviewed, Caltabiano denied that he raped the victim or possessed a firearm.   He claimed that he had met the victim that night, engaged in consensual oral sex, and then left her at the Cumberland Farms n Catskill after the victim "said something that made him mad."   However, Caltabiano pled guilty on March 26, 1991 to Sexual Abuse 1st, and was sentenced to time served (6 months) and 5 years of probation.

Caltabiano was found to have violated the terms of his probation in February 1992, but his probation was continued.   He was found to have again violated the terms of his probation in May 1993, after attempting to abduct another young woman, *see* Part vi, *infra*, and was resentenced to a term of one to three years.   Caltabiano was paroled in October 1994, but his parole was revoked in August 1995 for reasons that are unclear.   He was released at the maximum expiration of his sentence, in October 1995.

This offense generates three criminal history points because Caltabiano was sentenced to more than one year and one month of imprisonment and served a portion of the sentence within 15 years of his commission of the instant offense.   *See* U.S.S.G. §4A1.1(a).

iv.   Unauthorized Use of a Motor Vehicle – July 1991 – PSR ¶ 69

Less than three months after his release from imprisonment, and while on probation for his 1991 Sexual Abuse 1st conviction, Caltabiano was arrested and charged on June 4, 1991, with Grand Larceny 4th: Motor Vehicle in Cairo Town Court.   He pled guilty on July 1, 1991, to Unauthorized Use of a Motor Vehicle, a misdemeanor, and was sentenced to 60 days of

imprisonment, but his probation was continued.    No additional information is known about this offense.

This offense generates no criminal history points because the sentence was imposed more than ten years prior to the defendant's commission of the instant offense.  *See* U.S.S.G. §4A1.2(e).

        v.        <u>Credit Card Fraud – November 1991 – PSR ¶ 70</u>

On August 28, 1991, while still on probation for his 1991 Sexual Abuse 1st conviction and within a month or so of his release from confinement following his conviction for unauthorized use of a motor vehicle, Caltabiano was arrested and charged with Forgery 2nd and petit larceny in Albany City Court.    According to the complaint, the defendant purchased a tire and had service done to his vehicle at a service station in Albany.   He told the service men he would return to pay for the service, but never did so.   On the same date, Caltabiano used a stolen Visa credit card to make more than $800 of purchases at the Hilton Hotel in Albany for room rentals and bar purchases.   Caltabiano pled guilty to petit larceny on November 6, 1991, and was sentenced to 60 days imprisonment.

This offense generates no criminal history points because the sentence was imposed more than ten years prior to the defendant's commission of the instant offense.  *See* U.S.S.G. §4A1.2(e).

        vi.        <u>Attempted Abduction – April 1993 – PSR ¶ 70</u>

While still on probation for his 1991 Sexual Abuse 1st conviction, and less than two years following his most recent release from confinement, Caltabiano was arrested and charged on April 2, 1993, in Catskill Village Court, with Criminal Impersonation 1st.    Caltabiano impersonated a police officer by displaying a badge and requesting that a 19-year-old woman

come with him in his car, purportedly to the police station, in order to identify an armed robbery suspect.   Caltabiano "Mirandized" his victim, who had just arrived at 5:00 a.m. to open up the Dunkin' Donuts at which she worked, and asked her whether she could verify who else worked at the restaurant.   The victim indicated that before she could go with him she had to call her boss.   After the victim confirmed that Caltabiano had displayed a badge, and after Caltabiano himself spoke with the victim's boss on the phone, the victim's boss agreed that she should go with Caltabiano.   Caltabiano told the victim she had to ride with him in his vehicle, but that her boyfriend, who was also present, should stay at the store.   Fortunately, as Caltabiano drove away with the victim in his car, the victim's boyfriend followed, at her request.   Caltabiano continued to stress to the victim that her boyfriend was to stay at the store, and that she could trust him because he was "a cop," but ultimately, when the victim's boyfriend continued to follow, Caltabiano told the victim she could go, and let her out of his car.

Three days after his arrest Caltabiano pled guilty to unlawful imprisonment 2nd and criminal impersonation 2nd, both misdemeanors, and was sentenced to one year imprisonment on both counts, to run concurrently.   The following month he was found guilty of violating his probation on the sexual abuse 1st conviction, and was sentenced to a 1-3 year indeterminate sentence, to run concurrently with the sentence on the new offenses.

This offense generates no criminal history points because the sentence was imposed more than ten years prior to the defendant's commission of the instant offense.  *See* U.S.S.G. §4A1.2(e).

       vii.   <u>Unemployment Insurance Fraud – May 2000 – PSR ¶ 72</u>

On January 27, 2000, less than six years after his release from confinement, Caltabiano was arrested and charged in Hudson City Court with Grand Larceny 4th and False Sworn

Statement 2nd for unemployment insurance fraud.   From April 21, 1998, through July 18, 1998, Caltabiano made weekly certification calls to the New York State Department of Labor, during which he falsely stated that he was not working.   As a result of his false certifications, before his crime was discovered Caltabiano received approximately $1,828 from the New York State Department of Labor to which he was not entitled.   Caltabiano pled guilty on May 16, 2000, to a reduced charge of petit larceny and was sentenced to three years of probation.   His probation was revoked in September 2001, a month after he was arrested for attempting to abduct yet another young woman.   *See* Part viii, *infra*.

This offense generates one criminal history point because it did not result in a sentence of imprisonment, but was imposed within the period ten years prior to the defendant's commission of the instant offense.   *See* U.S.S.G. §§4A1.1(c) and 4A1.2(e)(2).

viii.   Attempted Abduction – February 2002 – PSR ¶ 73

While on probation for his May 2000 petit larceny conviction, Caltabiano was arrested after he attempted to abduct another nineteen-year-old woman less than one year after his previous conviction.   The disturbing offense conduct is similar to that underlying some of Caltabiano's prior offenses.   On April 13, 2001, at approximately 4:45 a.m., the victim exited a market and was on her way to work.   As she exited the store and walked toward her car, she saw Caltabiano sitting in a pick-up with the engine running.   As the victim passed his truck, Caltabiano opened the door and asked her for directions.   He told her was going to Carousel Mall.   The victim began giving Caltabiano directions.   In doing so, as she turned toward the interstate sign, Caltabiano grabbed her from behind, reached around her neck with his left hand, and used his right arm to pull her left fist back towards his body.   Caltabiano told the victim: "Don't say a fucking thing and get in the truck."   Fortunately, the victim fought, screamed, and

15

managed to escape from Caltabiano.   Caltabiano drove off and was not apprehended until August 2001.   He admitted to being at the market where the victim had reported the attempted abduction, and reported he had been drinking and was high at the time he encountered the victim. Caltabiano claimed that he recalled passing her as she exited her vehicle and saying "hi" to her, and that the next thing he remembered, he had grabbed her around the upper part of her body. According to Caltabiano, he let the victim go after she screamed and noted that he "thought he had broken something."   Caltabiano admitted that he had been angry that morning, but stated "I didn't want to hurt the girl, I let her go.   I didn't put her in the truck.   I don't even know what she looks like, it happened too quick."   Caltabiano pled guilty on February 11, 2002, in Van Buren Town Court, to Attempted Unlawful Imprisonment 1st, and was sentenced to 6 months of imprisonment.

This offense generates two criminal history points because Caltabiano was sentenced to less than one year and one month of imprisonment and served a portion of the sentence within 10 years of his commission of the instant offense.   *See* U.S.S.G. §§4A1.1(b) and 4A1.2(e)(2).

ix.   Criminal Conduct After February 2002

Following Caltabiano's completion of the six month sentence imposed in February 2002, he pled guilty in December 2004 in Oswego City Court to one count of issuing a bad check, a misdemeanor that is not scored.   *See* U.S.S.G. §4A1.2(c)(1).   A bench warrant was issued in connection with that case in February 2005.

x.   The April 2008 Start of the Instant Offense

As proven at trial, and as reflected in the PSR, in April 2008, Caltabiano and McCarten began their conspiracy to commit mail fraud in order to obtain Social Security and Workers' Compensation benefits to which Caltabiano was not entitled.   This was approximately four

years after Caltabiano's most recent criminal conviction, and six years after Caltabiano's most recent conviction for attempting to abduct a young woman.

xi.   <u>Argument</u>

His relatively lenient prior sentenced notwithstanding, the defendant's criminal history reflects that he is a dangerous sexual predator and confirmed recidivist. "[T]he totality of [Caltabiano's] criminal conduct, revealed in part by the sequence of outdated convictions" is such that CHC III does "not adequately reflect the seriousness of his past conduct or the likelihood that he [will] commit other crimes."   *United States v. Diaz-Collado*, 981 F.2d 640, 644 (2d Cir. 1992) (upholding district court's departure from CHC IV to V because the defendant had received extremely lenient sentences for his outdated convictions and due to the "frequency" of the outdated convictions, ***even though the convictions related to conduct dissimilar to the conduct for which the defendant was being sentenced***).   *See also United States v. Franklyn*, 157 F.3d 90, 99 (2d Cir. 1998), *cert. denied*, 525 U.S. 1027 (1998) (upholding district court's determination that ""a CHC of II was an 'understatement of the likelihood of recidivism and the seriousness of the defendant's past criminal conduct'" and departure from CHC II to CHC IV).

CHC III substantially under-represents the seriousness of Caltabiano's criminal history because some of his serious prior offenses are not adequately scores, in part due to the lenient sentences that were imposed.  Most significantly, the defendant's April 2, 1993, convictions in Catskill Village Court for the misdemeanor offenses of unlawful imprisonment in the second degree and criminal impersonation in the second degree, for which he received was sentenced to one year imprisonment on each count.  *See* PSR ¶ 71.  Had that case been resolved with a disposition that resulted in a sentence of more than one year and one month, three additional criminal history points would have been added, pursuant to U.S.S.G. §4A1.1(a), and the defendant

17

would have a total of 9 criminal history points, placing him at the top end of CHC IV – a more appropriate category – rather than the top end of CHC III.   Although Caltabiano was permitted to plead guilty to two misdemeanors, for which he received the maximum statutory sentences of one year, the facts underlying the 1993 convictions demonstrate that they were grounded upon the sort of serious dissimilar criminal conduct that should be counted for CHC purposes.   This is particularly so given the timing and relationship of the conduct underlying his 1993 offenses to other serious offenses committed by Caltabiano, including his sexual assault or attempted abduction of at least three other teenage girls.

U.S.S.G. §4A1.2 establishes the time period within which prior sentences are counted for purposes of a defendant's CHC calculation.   However, the Guideline's commentary specifically provides: "***If the court finds that a sentence imposed outside this time period is evidence of*** similar, or ***serious dissimilar, criminal conduct***, the court may consider this information in determining whether an upward departure is warranted under §4A1.3 (Adequacy of Criminal History Category)."   U.S.S.G. §4A1.2, Application Note 8 (emphasis added).   Caltabiano's 1993 attempted abduction of a nineteen year old, under the guise that he was a police officer, would have produced criminal history points but for the fact that Caltabiano was permitted to quickly plead guilty to misdemeanors and have his parole for an earlier sex offense revoked. The fact that Caltabiano's 1993 convictions both followed and preceded strikingly similar and equally serious convictions involving the attempted abduction and/or sexual abuse of young women makes it even more important that the 1993 conviction be considered when arriving at an appropriate CHC.   The commentary to U.S.S.G. §4A1.3 notes:

> This policy statement recognizes that the criminal history score is unlikely to take into account all the variations in the seriousness of criminal history that may occur. For example, a defendant with an extensive record of serious, assaultive conduct who had received what might now be considered extremely lenient treatment in the

past might have the same criminal history category as a defendant who had a record of less serious conduct.   Yet, the first defendant's criminal history clearly may be more serious.

U.S.S.G. §4A1.3, Commentary, Background.

And this is to say nothing of Caltabiano's other four unscored convictions, which would have resulted in the addition of criminal history points but for their age, or the fact that Caltabiano committed half of his prior offenses while on probation or parole.   In sum, he is substantially more dangerous and likely to commit additional crimes than CHC III reflects.

### d.        Guidelines Range and Sentence

As described above, the PSR concludes that the combined offense level is 21 and the criminal history category is III.   The government concurs with the calculations in the PSR.   For the reasons set forth above, however, the government requests that the Court depart upward one criminal history category, to CHC IV.   The federal sentencing guidelines would then advise that the defendant receive a sentence of 57 to 71 months of imprisonment and a supervised release term of 1 to 3 years.

### 3.        Restitution

The imposition of an order requiring payment of restitution in full, according to a schedule set by the Court, is mandatory pursuant to 18 U.S.C. §§ 3663A(c)(1)(A) and 3664(f).   The Social Security Administration suffered direct financial losses as a result of the defendants' conduct in the amount of $27,784, as set forth in the PSR at ¶ 95.

### 4.        Forfeiture

As set forth in the preliminary order of forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the government requests that the Court enter an order directing forfeiture to the United States in the form of a money judgment in the amount of $27,784.

## GOVERNMENT'S SENTENCING RECOMMENDATION

Based on all of the information before the Court, the government respectfully requests that the Court upwardly depart to CHC IV, sentence the defendant to a term of imprisonment within the resulting 57 to 71 month guidelines range, and impose an order of restitution in the amount of $27,784, an order of forfeiture in the amount of $27,784, and a special assessment of $700.

The sentence that the government recommends here is sufficient, but not greater than necessary to comply with the sentencing purposes in 18 U.S.C. § 3553(a)(2).   As the Court saw through the course of the trial, and as set forth in detail in the PSR at ¶¶ 9-49, Caltabiano was the primary force behind, and primary beneficiary of, a mail fraud scheme that continued for two and a half years.   Caltabiano's victims would have been defrauded of more than $1,000,000 had the scheme not been discovered and had Caltabiano's actual ability to function been captured on surveillance video.   Caltabiano and McCarten's efforts to perpetuate their fraud included pretending that Caltabiano was blind during an independent medical exam, providing false information on documents, and McCarten leading Caltabiano into a hearing before the workers' compensation law judge as if he were blind, all when surveillance videos showed that he could function on his own without visible difficulty.   The enormous potential financial rewards for those who commit disability fraud provide a strong incentive for dishonest individuals to engage in deception in order to steal.   And it is all too easy for them to do so.   A guideline sentence is necessary to deter others from committing similar offenses, and would be a fair and just sentence here, where the defendant, a lifelong criminal and sexual predator who poses a continuing danger to society, both economic and physical, has refused to accept responsibility for his wrongdoing.

"[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *see*, *e.g.*, *Gall v. United States*, 552 U.S. 38, 46 (2007) (Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").    Moreover, within-guidelines sentences promote Congress's goal in enacting the Sentencing Reform Act – "to diminish unwarranted sentencing disparity." *Rita v. United States*, 551 U.S. 338, 354 (2007).

The United States respectfully moves the Court for an order directing that the defendant be remanded immediately after sentence. *See* 18 U.S.C. § 3143(b).   The defendant has long been aware of the impending sentencing and faces a significant term of imprisonment under the applicable guidelines.   The defendant's attorney has not identified any substantial question of law or fact likely to form a viable basis for an appeal.

Respectfully submitted this 5th day of April, 2016,

RICHARD S. HARTUNIAN

United States Attorney

*/s/ Jeffrey C. Coffman*

By:  Jeffrey C. Coffman
Assistant United States Attorney
Bar Roll No. 517969

**<u>Certificate of Service</u>**

I hereby certify that on April 5, 2016, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which sent notification of such filing to:

> George E. Baird, Jr.
> George_Baird@fd.org

> *<u>/s/ Jeffrey C. Coffman</u>*
> Jeffrey C. Coffman